615 A.2d 704

COMMONWEALTH of Pennsylvania, Appellee,

v.

Ralph Trent STOKES, Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 21, 1991.

Decided Oct. 6, 1992.

244

246

Norris E. Gelman, Philadelphia, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Hugh Burns, Philadelphia, Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

CAPPY, Justice.

Three consecutive sentences of death were imposed upon Ralph Trent Stokes on June 9, 1987. Further cumulative consecutive sentences of ten to twenty years for robbery,[1] two and one-half to five years for possessing instruments of crime,[2] and five to ten years for criminal conspiracy[3] were also imposed. As this case culminated in a penalty of death it is subject to direct automatic review by this Court. 42 Pa.C.S. § 9711(h)(1). In accordance with our statutory duty we will begin with a review of the sufficiency of the evidence. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327, *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

█ Appellant's convictions resulted from his participation, along with Donald Jackson, in the robbery of Smokin' Joe's Korner on March 12, 1982. Smokin' Joe's is a restaurant and bar, where the appellant had been previously employed, located at 5100 City Line Avenue in the city of Philadelphia. At trial Mr. Jackson testified that he and appellant had donned

1. *See,* 18 Pa.C.S. § 3701.
2. *See,* 18 Pa.C.S. § 907.
3. *See,* 18 Pa.C.S. § 903.

blue jumpsuits and ski masks and equipped themselves with weapons in anticipation of the robbery. Jackson was armed with an automatic pistol and appellant carried a .38 caliber revolver.

The two men entered the restaurant through the unlocked rear kitchen door with their guns drawn. They confronted two restaurant employees in the kitchen, Renard Mills and Pierre Blassingame. A third restaurant employee, Eugene Jefferson, entered the kitchen from another part of the building about the same time. Appellant locked the three employees into a walk-in refrigerator, then proceeded into the restaurant office where he encountered Mary Figueroa, the restaurant manager and wife of one of the owners of Smokin' Joe's. Jackson joined appellant and Mrs. Figueroa in the office as appellant was forcing Mrs. Figueroa to open the safe. At that point Jackson noticed appellant's ski mask was pulled up off his face. Jackson told appellant to cover his face, to which appellant replied that he had already been recognized by Mrs. Figueroa. After Mrs. Figueroa opened the safe she was placed in the walk-in refrigerator with the other three employees. Mrs. Figueroa told the others that she had recognized "Trent." She then attempted to exert a calming influence upon the others in the refrigerator.

With everyone in the refrigerator, Jackson and appellant proceeded with their looting of the restaurant. Unfortunately, while these activities were in progress, Peter Santangelo, a mailman, happened upon the scene. Jackson opened the kitchen door a fraction sufficient enough to accept delivery of the mail, and then closed the door. Appellant, afraid of being discovered, chased after the mailman, bringing him into the restaurant and ordering him, at gun point, to lie on the kitchen floor. With Mr. Santangelo on the floor, appellant placed his ear against the refrigerator door in an effort to overhear the conversation among the persons therein.

Appellant then announced to Jackson that he had been identified and would have to "off" the witnesses. Whereupon, appellant opened the refrigerator and fired three shots, killing Eugene Jefferson and Mary Figueroa. Upon witnessing this

event, Peter Santangelo ran from the kitchen. Appellant cornered Mr. Santangelo at the locked front door and fired three more shots, leaving Mr. Santangelo as his third fatality.

Jackson, upon witnessing the murders, ran out the rear door and started the car. The vehicle was difficult to start, leaving sufficient time for appellant to join Jackson in the car. The two men then fled the scene. Appellant and Jackson went to the home of Jackson's friend, Eric Burley, where they divided the proceeds of the robbery and directed Burley to dispose of appellant's gun, the jumpsuits, and the ski masks worn during the commission of the crimes.

Viewed in the light most favorable to the Commonwealth, the evidence adduced at trial was sufficient to establish appellant's guilt beyond a reasonable doubt of each element on all three charges of murder in the first degree, robbery, possessing instruments of crime and criminal conspiracy. *Commonwealth v. Rollins*, 525 Pa. 335, 580 A.2d 744 (1990). We shall address the issues as raised by appellant in two sections, first those pertaining to the guilt phase, and then those issues raised in the penalty phase.

### The Guilt Phase

■ Appellant was afforded new counsel during the posttrial proceedings. Counsel for appellant raises six issues in the guilt phase, five of which are framed as ineffectiveness of trial counsel. This Court originally established a three prong standard for reviewing claims of ineffective assistance of counsel in *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). Recently, that standard was succinctly delineated in *Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991): "1) is the issue underlying the claim of ineffectiveness of arguable merit; 2) does the course chosen by counsel have a reasonable basis designed to serve appellant's interest; and 3) has the appellant suffered prejudice as a result of counsel's ineffectiveness." *Id.* 526 Pa. at 609, 587 A.2d at 1382. With this standard in mind we begin our review of the allegations of trial counsel's ineffectiveness.

Appellant raises two allegations of error concerning the trial court's instructions to the jury. The first pertains to the presumption of innocence and the right to remain silent, and the second relates to the definition of reasonable doubt. In each instance appellant focuses on a small portion of the court's charge, to which he claims trial counsel should have objected. In *Commonwealth v. Prosdocimo*, 525 Pa. 147, 578 A.2d 1273 (1990), this Court reiterated the standard of review regarding the wording of a trial court's charge to the jury.

When evaluating jury instructions, the charge must be read as a whole to determine whether it was fair or prejudicial. The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration.

*Id.* at 150, 578 A.2d at 1274.

In the instant case the trial court expanded on the standard jury instructions by using its own words to set forth further illustrations of the legal points to be considered. First, we will address the objections to the charge on the presumption of innocence and the right of a defendant in a criminal case to remain silent.

The court repeated the language at issue in the opening instructions to the jury and in the final instructions before deliberation. The relevant section of the charge as fully given at the close of trial is as follows, with the portion complained of underlined.

It's not the defendant's burden to prove his innocence or that he is not guilty. The defendant who is the person accused of crime is not required to present evidence or prove anything in his own defense. There is no burden or responsibility to prove anything.

Further, as you recall, you must not presume, infer, conclude, or entertain any idea, inference, presumption, negative inference, or inkling of his guilt of the charges to which he stands accused from the fact that he has not testified in his own behalf in this case.

The defendant has a right to remain silent and not to testify. You are not by the indirect mental process of assertion to his right to silence to conclude that he is in any respect guilty, done anything wrong, or is hiding anything by the assertion of *his right not to incriminate himself and to remain silent and not to take the witness stand as a party defendant.*

Again, the defendant, as a person accused of the crime, is not required to present evidence or prove anything in his own defense.

Appellant asserts that the word incriminate creates the impression in the minds of the jurors that had appellant taken the stand his own testimony would have proven his involvement in the crimes charged. Unfortunately, the words chosen by the trial judge were not the best that could have been used to proclaim the rights at issue. We take this opportunity to caution trial judges that this phrasing is inappropriate.

■ However, we will not review a charge to the jury by focusing on one or two words taken out of the context within which they were spoken. Clearly, the charge as a whole reflects the emphasis upon a defendant's right to remain silent and the sincere efforts by the trial court to convey to this jury that no adverse inference must be drawn from the fact that a person charged with a crime exercises his constitutional right not to speak in his own defense.[4] As the charge, in its entirety, "sufficiently and accurately" apprised the jury of the law it was to consider, we cannot find trial counsel ineffective for failing to object to the improper choice of a few words.[5] *Prosdocimo*, 525 Pa. at 154, 578 A.2d at 1276.

■ The second objection to the trial court's charge to the jury focuses on the use of the word substantial in defining

4. The instant case is readily distinguishable from the situation in *Commonwealth v. Lewis*, 528 Pa. 440, 598 A.2d 975 (1991), where the trial court, in light of a defendant's specific request, failed to give a "no adverse inference" charge.

5. As we find that the charge as a whole adequately set forth the law for the jurors' consideration, we need not reach appellant's related question of whether or not the failure of counsel to object to this charge was harmless error.

reasonable doubt. During a rather lengthy charge on reasonable doubt, the court did at one point use the word substantial, in the following context: "A reasonable doubt is not merely an imagined or passing fancy that may come into the mind of a juror. It must be a doubt arising from the evidence that is substantial and well founded on reason and common sense."

Appellant argues that the use of the word substantial in one place in a charge on reasonable doubt, that exceeded three pages of transcript, and that in all other aspects perfectly followed the legal definition of this concept as set forth in *Commonwealth v. Drum,* 58 Pa. 9, 22 (1868), is per se reversible error. In support of this argument appellant relies on the recent United States Supreme Court per curiam decision in *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Appellant's reliance upon the decision in *Cage* dilutes the significance of the opinion in that case.

The charge found to be reversible error in *Cage* was as follows:

If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such a doubt as would give rise to a grave uncertainty,* raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty.* (emphasis in original).

498 U.S. 39, 40, 111 S.Ct. 328, 329, 112 L.Ed.2d 339 (1990).

In reversing and remanding *Cage* on the basis of the above charge the Supreme Court made it clear that it was because of

the impact of the entire charge. The Court found "a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Id.* at 41, 111 S.Ct. at 330. In the case *sub judice,* the charge given, even with the inclusion of the word substantial, does not create the mischaracterization of the concept of reasonable doubt so strongly disfavored by the United States Supreme Court in *Cage.* The following excerpt from the charge, in the case at bar, on reasonable doubt illustrates the sophistry of appellant's argument:

A reasonable doubt is such a doubt as would cause a person to hesitate in arriving at a conclusion in a matter of importance to that person; therefore, should you, after considering all of the evidence, have in your mind such a doubt as would cause you to hesitate in arriving at a conclusion in matters of importance to yourselves, then it is your duty to give the defendant the benefit of that reasonable doubt and find him not guilty.

The doubt to be reasonable must be one which fairly strikes a conscientious mind and clouds the judgment. It is not such a doubt as one might dig up, conjure up, or summon up out of nowhere for purposes of escaping the consequences of an unpleasant verdict or verdicts, but it is a doubt which is reasonable, an honest and real doubt fairly arising out of the evidence that is presented with respect to some element of the crime.

A reasonable doubt is not merely an imagined or passing fancy that may come into the mind of a juror. It must be a doubt arising from the evidence that is *substantial* and well founded on reason and common sense.

A reasonable doubt such as one taken notice of by a juror in deciding the case or a question in the case is of the same nature as a doubt that would cause a reasonable man or woman in the conduct of his or her own affairs in a matter of importance to himself or herself to stop, hesitate, and seriously consider as to whether he or she should do a certain thing before finally acting. (emphasis added).

The tenor of the charge at issue is to contrast reasonable doubt with imaginary doubt. Unlike the charge in *Cage*, this charge does not alter the burden placed upon the Commonwealth. Although we acknowledge that the United States Supreme Court sets the minimum level to be maintained on the protection of constitutional rights, we do not believe that the charge in the instant case violates that level of protection as set forth in *Cage*. *Commonwealth v. Lewis*, 528 Pa. 440, 598 A.2d 975 (1991). Once again, we cannot agree that trial counsel was ineffective in failing to object to the use of one, possibly improper, word in an otherwise model charge.

The next question of ineffectiveness raised by appellant is that trial counsel was inadequate for failing to impeach Donald Jackson with his entire criminal record of both arrests and convictions. Only Jackson's prior convictions for crimes of a crimen falsi nature were used by counsel in an attempt to impeach his credibility.

Donald Jackson, according to his own testimony, conspired with appellant to rob Smokin' Joe's Korner. Jackson pled guilty to the charges of robbery, conspiracy and murder in the second degree, resulting from his involvement in the heinous events at Smokin' Joe's. In exchange for his plea to those crimes, Jackson was offered a life sentence, conditioned upon his testimony against appellant in the instant trial. During the course of his testimony the arrangement concerning Jackson's plea was revealed to the jury. In addition, Jackson was thoroughly cross-examined regarding his lengthy list of prior convictions. Appellant now argues that the impeachment of Jackson should have included the prior crimes for which he was arrested but not convicted, and all convictions, regardless of their lack of relevancy to the issue of Jackson's credibility.

In support of this argument appellant asserts that under 42 Pa.C.S. § 5918, Jackson was a "defendant," and thus no limitations should apply to impeachment of him as a defendant/witness.[6] This argument is untenable for two reasons.

6. 42 Pa.C.S. § 5918 provides:

First, the plain meaning of the statute is that a defendant may only be subject to cross-examination when he testifies at his own trial, either in his own behalf, § (1), or, if he testifies against a co-defendant, during their joint trial, § (2). In the instant case, Jackson was not a co-defendant in a joint trial with appellant "charged with the same offense." 42 Pa.C.S. § 5918(2).

Second, the law regarding impeachment of a witness and impeachment of a defendant is consistent in prohibiting impeachment regarding prior arrests and prior convictions for crimes not involving crimen falsi. *See, Commonwealth v. Penn,* 497 Pa. 232, 439 A.2d 1154 (1982), *cert. denied,* 456 U.S. 980, 102 S.Ct. 2251, 72 L.Ed.2d 857 (1982), (impeachment of witness limited to prior convictions of a crimen falsi nature); *Commonwealth v. Randall,* 515 Pa. 410, 528 A.2d 1326 (1987), (impeachment of a defendant limited to prior convictions of crimen falsi nature).

Accordingly, regardless of what designation Jackson was referred to in the proceedings at bar, witness, defendant or co-defendant, the use of his prior arrests and prior convictions for non crimen falsi crimes was not an appropriate line of questioning for trial counsel. Trial counsel was thus not ineffective in failing to proceed with a line of inquiry which is prohibited.

■ In a related issue, appellant asserts that trial counsel was ineffective in not requesting that appellant be tried before another jurist, as the trial judge herein had also accepted the plea agreement under which Jackson was testifying. Appel-

No person charged with any crime and called as a witness in his own behalf, shall be asked, or if asked, shall be required to answer, any question tending to show that he has committed, or been charged with, or been convicted of any offense other than the one wherewith he shall then be charged, or tending to show that he has been of bad character or reputation unless:

(1) he shall have at such trial, personally or by counsel, asked questions of the witness for the prosecution with a view to establish his own good reputation or character, or has given evidence tending to prove his own good character or reputation; or

(2) he shall have testified at such trial against a codefendant, charged with the same offense.

lant is arguing that the jury would assume Jackson was telling the truth because he had entered into a plea before this same judge, a condition of which required that he testify truthfully at appellant's trial, and that he remained unsentenced upon the plea until completing his obligation to testify. In his brief, appellant urges that the jury would assume that the judge was monitoring Jackson's testimony as an assurance that Jackson tell the truth.

Appellant's speculative assertions are not supported by the record. The specifics of Jackson's plea agreement, as outlined for the jury by the testimony of a clerk of the quarter sessions and Jackson himself, were that Jackson was to "testify" in appellant's trial. There was never any reference during the exchanges among any of the witnesses regarding this agreement, that Jackson's plea was contingent upon his "telling the truth." *Cf. Commonwealth v. Bricker,* 525 Pa. 362, 581 A.2d 147 (1990). Further, in his final charge to the jury, the judge reiterated the circumstances of Jackson's plea agreement and cautioned the jurors that "the testimony of Donald Jackson as an accomplice should be looked upon with disfavor since— because it comes from a corrupt and polluted source."

The record fails to disclose any reason for trial counsel to have requested appellant's case be heard by a different jurist. Again, trial counsel cannot be found ineffective for failing to pursue a meritless course of conduct.

■■■ The remaining issue raised in the guilt phase refers to error by the trial court. Appellant maintains that it was error for the trial court to allow the introduction of a hearsay statement uttered by the deceased victim Mary Figueroa, shortly before her death. The statement was uttered by Figueroa upon her being placed in the meat locker with the other employees. As testified to by one of the surviving victims, Renard Mills, Mary stated, "That was Trent. I don't believe it was him. I don't believe that he would do anything like this."

The trial court permitted the statement to come in as an excited utterance exception to the hearsay rule. In order to qualify as an excited utterance a statement must be:

[A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.... Thus, it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event. [Citations omitted.]

*Commonwealth v. Green*, 487 Pa. 322, 326–27, 409 A.2d 371, 373–74 (1979).

At the time the statement was uttered by Mary Figueroa she was caught in the midst of an armed robbery, during which she had been coerced at gunpoint to open the restaurant safe, and then forcibly ordered into a locked refrigerator. The circumstances clearly establish that a startling occurrence was in progress, one in which Mary Figueroa was forced to participate. Her statement that she recognized "Trent," and couldn't believe it was him, more accurately reflects her excited condition, than any deliberative thought process on her part.

Appellant's argument that Mary was not emotionally overcharged is premised upon the fact that she attempted to calm down the others within the refrigerator. This activity, although consistent with a passive reaction to the events surrounding Mary at the time, is equally consistent with an attempt to control her own overwhelming fear under the circumstances. Thus, we find no error on the part of the trial court in admitting this statement under the excited utterance

exception to the hearsay rule. We now turn to appellant's arguments relating to the penalty phase.

## The Penalty Phase

The jury found two aggravating circumstances and no mitigating circumstances as to each of the three indictments. Thus, a sentence of death was imposed for the murder of Peter Santangelo, a sentence of death was imposed for the murder of Mary Louise Figueroa, and a sentence of death was imposed for the murder of Eugene Jefferson. The same two aggravating circumstances were found as to each indictment; the defendant committed the killing while in the perpetration of a felony, and in the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.[7]

The appellant now raises seven allegations of error as to the imposition of the three consecutive sentences of death. The first allegation is that the trial court erred in its charge to the jury regarding the conditions under which they could find aggravating circumstance (d)(7) (grave risk of death to others). For the reasons that follow we find that the trial court did in fact err in the manner in which it charged the jury as to this particular aggravating circumstance. The charge as given reads:

The aggravating circumstance No. 2 reads as follows: 'In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.'

Reasoning this way in your deliberations in each of the criminal Information covering the killing of each of the victims, as a matter of logic, the deaths of the other two victims would be an aggravating circumstance with respect to your deliberations with respect to each Information.

Simply stated, in the deliberation on the criminal Information covering the killing of and the verdict of murder in the first degree on Santangelo, the killing of Figueroa and

7. 42 Pa.C.S. § 9711(d)(6) & (7).

Jefferson would be aggravating circumstances with respect of Santangelo.

With respect to the Figueroa Information, the killing of the other two victims, Santangelo and Jefferson, would be the aggravating circumstances on that criminal Information.

That's a matter of logic, because, under the aggravating circumstances as stated in the sentencing code, it reads: 'In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.'

I can think of, as a matter of logic and reason, no greater risk of death other than the fact that death was actually executed with respect to more than one person in any given set of circumstances involving the criminal homicide of one victim.

Appellant correctly asserts that the trial court misstated the intent of this particular aggravating circumstance and compounded that error by essentially directing the jury that this aggravating circumstance must "as a matter of logic" be found in each information. The aggravating circumstance at issue applies to situations where the defendant in the course of killing his particular victim acts in a manner which endangers the lives of others close in proximity to the intended or actual victim. *See, Commonwealth v. Rollins,* 525 Pa. 335, 580 A.2d 744 (1990) (defendant created a grave risk of harm to the sister and nephew of his intended victim who were in the same room when the defendant, firing wildly, shot the decedent, a stereo speaker and a lamp).

The way the trial court explained the application of this particular aggravating circumstance to the case left the jurors with no discretion. The trial court precluded the jury from properly executing their function to determine if under the facts of this particular case, the appellant "knowingly created a grave risk of death to another person in addition to the victim of the offense" when each of the decedents was killed. Although, on the facts of the instant case it would have been possible for the jury to find that the appellant created a grave risk of death to Renard Mill and Pierre Blassingame, who

were in the walk-in refrigerator with Mary Figueroa and Eugene Jefferson at the moment appellant opened the refrigerator door and fired three shots, killing Figueroa and Jefferson, the trial court by the way it charged the jury, precluded just such a finding. However, there were no other persons in close proximity to Peter Santangelo, as appellant closed the refrigerator door before chasing Santangelo into another room where he was then shot and killed by appellant, thus, the charge was completely inapplicable to the murder of Santangelo.

Regardless of what would have been reasonable on the facts of this case, the manner in which the trial court charged the jury on the aggravated circumstance of creating a grave risk of death to others precluded the jury from properly analyzing the applicability of that circumstance to the facts of this case. For that reason, the jury's finding of aggravating circumstance (d)(7) as to each information against appellant must be stricken. However, as the jury found one other aggravating circumstance, "the defendant committed a killing while in the perpetration of a felony" 42 Pa.C.S. § 9711(d)(6), as to each information, and no mitigating circumstances as to any of the three informations, all three sentences of death must be affirmed. *Commonwealth v. Christy*, 511 Pa. 490, 515 A.2d 832 (1986), *cert. denied*, 481 U.S. 1059, 107 S.Ct. 2202, 95 L.Ed.2d 857 (1987); 42 Pa.C.S. § 9711(c)(iv).

Appellant next contends that trial counsel was ineffective for not arguing at the penalty phase that mitigating circumstance (e)(1), "The defendant has no significant history of prior criminal convictions," should have been considered by the jury. Appellant had a lengthy record of juvenile adjudications, however, at the time of the instant murders he was 19 years of age and had no record of adult convictions. Appellant reasons that juvenile adjudications would not be admissible as prior convictions, as they were "adjudications of delinquency" and not "convictions" thus; he had the right to argue (e)(1) as a mitigating factor before the jury. Appellant asserts that he was prejudiced by trial counsel's failure to offer this argument at the penalty phase.

Appellant's assertion is without merit. In *Commonwealth v. Baker*, 531 Pa. 541, 614 A.2d 663 (1992), this Court held that juvenile adjudications are admissible as "convictions" for consideration by the jury in a death penalty proceeding, under aggravating circumstance (d)(9): "the defendant has a significant history of felony convictions involving the use or threat of violence to the person." [8] Thus, trial counsel's failure to pursue this deceptive offer of a mitigating circumstance was not prejudicial to the appellant. As this Court has stated on numerous occasions, trial counsel cannot be found ineffective for failing to pursue a meritless claim. *Commonwealth v. Tilly*, 528 Pa. 125, 595 A.2d 575 (1991).

Appellant also charges trial counsel was ineffective in the failure to present a "relevant" summation to the jury at the penalty phase. Admittedly, the summation proffered was brief and limited to an appeal for mercy. However, the jury had just, in a very brief deliberation, found the appellant guilty of three counts of first degree murder. Trial counsel explained during the post-trial hearing that he felt a further recital of the evidence would not benefit his client and thus tailored his summation to reach the jury on an emotional level.

Appellant argues that counsel should have offered more in an attempt to have the jury see the appellant in a more favorable light. He asserts that the lack of a prior adult record should have been pursued and that appellant's family should have testified to garner sympathy. As previously discussed, the lack of an adult record would have been an argument unavailable to appellant in light of our recent opinion in *Baker*. Further, use of appellant's family members would have permitted the prosecution an opportunity to question them on more unsavory aspects of appellant's character, such as his juvenile record.

The right to present a summation is clearly a component of the right to representation by counsel. *Stewart v. Commonwealth*, 117 Pa. 378, 11 A. 370 (1887). However, the

8. Although this author dissented from the majority position on this particular issue in *Baker*, I acknowledge that the majority view is the law in Pennsylvania.

decision of whether to give a summation, or what type of summation, is a matter of trial strategy. *Commonwealth v. Gambrell*, 450 Pa. 290, 301 A.2d 596 (1973). Absent a finding of incompetency, counsel's strategic decisions will not be overturned. *Commonwealth v. Saxton*, 516 Pa. 196, 532 A.2d 352 (1987). Trial counsel's decision to give a brief emotional summation was a strategic one and does not constitute a finding of incompetency. Nor can it be said on this record that the strategy chosen would support a finding of prejudice to the appellant. *Id.* at 207, 532 A.2d at 357.

▮▮▮ Appellant next asserts that the trial court erred in limiting his testimony at the penalty phase. Appellant did not testify in his own behalf at the guilt phase. After lengthy discussions with trial counsel, appellant agreed to testify at the penalty phase to assert his innocence. During the guilt phase, trial counsel's strategy had been to cast doubt on the identifications made of appellant as the shooter, and instead create the inference that the co-defendant, Donald Jackson, was the actual shooter. Attempts were also made at the guilt phase, through the testimony of various family members, to construct an alibi for appellant.

In the penalty phase, appellant took the stand to convince the jury that he did not kill Mary Figueroa, Eugene Jefferson or Peter Santangelo. During his testimony, appellant also attempted to persuade the jury that he had not even been present at Smokin' Joe's at the time the murders occurred. The prosecutor objected to any testimony as to appellant's alibi, as the jury had already determined that question contra to appellant. The trial court properly sustained the objection, as testimony regarding appellants's guilt was no longer relevant at the sentencing phase. The appellant's testimony was properly limited to a consideration of the appropriate aggravating and mitigating circumstances at the penalty phase. *Commonwealth v. Abu–Jamal*, 521 Pa. 188, 555 A.2d 846 (1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 175 (1990).

In his final two arguments, appellant asserts that the verdict slip sent with the jury in the instant case violated the principles of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860,

100 L.Ed.2d 384 (1988), and that the *Mills* decision should be applied retroactively to his case.

In *Mills* the verdict slip, along with the instructions to the jury, created a substantial risk that the jurors would be misled into thinking that any mitigating circumstance must be found unanimously. The verdict slip in the instant case does not contain any language which would so mislead the jury. Further, the instructions given to the jurors were in compliance with the penalty statute and the decision of this Court in *Commonwealth v. Frey,* 520 Pa. 338, 554 A.2d 27 (1989), *cert. denied,* 494 U.S. 1038, 110 S.Ct. 1500, 108 L.Ed.2d 635 (1990). Therefore, as the verdict slip did not violate the teachings of *Mills,* we need not discuss the question of whether or not *Mills* should be applied retroactively to the instant case.

Finally, in compliance with our statutory duty pursuant to 42 Pa.C.S. § 9711(h)(3) we must affirm the sentence of death unless we determine that the sentence was the product of passion, prejudice or any other arbitrary factor; the evidence fails to support the finding of at least one aggravating factor; or the sentence is excessive or disproportionate to the penalty imposed in similar cases. Upon such review we find that the sentences of death imposed in this case comply with the concerns set forth in the statute. The sentences were not arbitrarily arrived at; nor were they the product of passion or prejudice; the evidence supports the aggravating factor of death occurring in the course of a felony and we find no excessiveness or disproportionality when compared to the sentences imposed in similar cases.

Accordingly we affirm the judgment of the sentence of death in all three informations.[9] Judgment of sentences affirmed.

McDERMOTT, J., did not participate in the decision of this case.

NIX, C.J., and LARSEN and PAPADAKOS, JJ., concur in the result.

9. The Prothonotary of the Supreme Court is directed to transmit the complete record of the case *sub judice* to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).